(571 P.2d 80)
No. 48,725

Roy C. Monfort and Betty L. Monfort, *Appellants,* v. R. M. Layton, Wm. Douglas Layton and Clyde G. Layton D/B/A Layton Oil Company, and Layton Oil Company, a Corporation, *Appellees.*

Opinion filed September 30, 1977.

*Orville J. Cole,* of Garnett, and *Stanley E. Toland,* of Toland and Thompson, of Iola, for the appellants.

*Ross E. Borders,* of Independence, for the appellees.

Before Foth, P.J., Abbott and Rees, JJ.

Foth, J.: This is an action for salt water damage to plaintiffs' crops caused by oil drilling operations on plaintiffs' Allen county land. The action was based on a 1964 letter from defendants setting forth the agreed method for determining plaintiffs' loss each year and agreeing to pay it; the action was not based on any claim of negligence in defendants' operations as lessees. The trial court awarded damages for each year until the underlying lease expired in 1974. Plaintiffs have appealed, complaining about the amount of damages awarded for two of the years involved, and also contending that defendants' contractual obligation to pay continued so long as crop damage appeared, regardless of the term of the lease.

The damaged land amounts to some 32.21 acres out of 115 covered by an oil and gas lease first granted by the plaintiffs, Mr. and Mrs. Roy C. Monfort, in 1950. The lease contained provisions that "all salt water [was] to be put back into well" and that the "[l]essee shall pay for damages caused by its operations to growing crops on said land." The defendants R. M., W. D., and C. G. Layton (the Laytons) acquired the working interest in the lease by assignment in August, 1961. (Subsequent assignments and reassignments and the formation of the corporate defendant, Layton Oil Company, are immaterial to the issues presented.)

It was during that summer or fall that Roy Monfort first noticed damage to his crops. The first indication was moisture in low areas even though there had been no recent rain. That fall the soy beans planted in the area yellowed and failed to produce. Monfort first discussed the matter with the Laytons' field foreman and then with the Laytons. It was determined that the damage was probably caused by seepage from a salt water pond constructed by the Laytons' predecessor lessee, Gordon Willis. In any event, by late 1962 it was agreed that the Laytons would pay for the annual damage. In November of 1962 the damaged area was measured and mapped by the county extension agent, and in December the Laytons paid plaintiffs $1,178.75 for agreed damage to the 1961 and 1962 crops.

Damages for 1963 were settled and paid, and in 1964 the Laytons wrote Monfort the letter on which this suit is based:

"This letter confirms our verbal agreement on the damages to land . . . that was damaged from the salt water pond built by Gordon Willis.

"It is agreed that you will measure the annual yield from this area and if the yield is less than the yield for the area adjoining it because of the salt water damage, we agree to make up the difference."

For the first two or three years Monfort's measurements of yields from damaged versus undamaged land were checked by the Laytons' foreman; after that Monfort was on his own. Damages were claimed and paid without controversy through the 1967 crop year. The claims for 1968 ($904.96) and 1969 ($1,015.95) were not paid until 1972, and then the check was $10 short. No further payments were forthcoming, and this suit was filed in 1974 for the $10 shortage plus damages for the years 1970 through 1974. The petition originally claimed $15,000 for an-

ticipated future losses, but at trial this claim was dropped and the petition was amended to include damages for the year 1975.

Based on Monfort's testimony as to actual measurements the court gave plaintiffs judgment for the $10 shortage for 1968 and 1969, $952.00 for 1970, $723.06 for 1971, and $945.00 for 1972. These were the sums prayed for, and plaintiffs make no complaint about this part of the judgment.

As to 1973 and 1974, Monfort testified that he made no actual measurement because the field was too wet. In fact, he didn't get all his 1974 crop harvested until 1975. He therefore based his claim for those two years ($700.00 each) on an estimate. The trial court found, "The evidence as to 1973 and 1974 damages is far too speculative," and awarded nominal damages of $10 for each of those years. This ruling raises plaintiffs' first claim of error.

The burden was on plaintiffs to prove both the cause and the amount of their damages for those years. As to the latter element, they were required to show at least "some reasonable basis for computation" from which the court could arrive at "an approximate estimate" of their damages. *Venable v. Import Volkswagen, Inc.,* 214 Kan. 43, 50, 519 P.2d 667. The trial court could have found a deficiency in proof on both aspects: any failure in the crop might well have been due to the excessive rainfall in those years, and there was no foundation for Monfort's estimate other than a comparison with losses in other years. However, these losses varied from $578.75 in 1962 to $2,560 for 1975. There was simply no figure for the court to settle on with any degree of certainty. Faced with the trial court's negative finding that plaintiffs failed in their burden of proof, we could only reverse on this issue if there were uncontroverted evidence compelling a positive finding, or extraneous considerations such as bias or prejudice not even suggested here. *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, 548 P.2d 719; *Short v. Sunflower Plastic Pipe, Inc.,* 210 Kan. 68, 500 P.2d 39. There being neither compelling evidence nor extraneous considerations, we must affirm on this issue.

The second issue presented is whether defendants' obligation to pay crop damage terminated when the underlying lease terminated in 1974. The original lease contained the customary provision extending its term so long as production continued. In August, 1966, the parties entered into an agreement permitting the lessees to continue the lease until July 1, 1969, by paying a

"minimum royalty" of $60 per month, even though there was no production and lessees conducted no operations on any part of the lease. There was apparently a further extension agreement, because Monfort testified that when he stopped getting crop damage checks he told the Laytons he wouldn't take any more rentals until they paid up, and that in July, 1974, "it expired by just not renewing." On this issue the trial court concluded:

"The letter of June 18, 1964, merely recites the mechanics which plaintiffs and defendants agreed to for determining the amount which defendants should pay for the damages their operations might cause during the life of the lease.

. . . . . . . . . . . . . . . . .

". . . The letter agreement of June 18, 1964, became part and parcel of the oil and gas lease, pertaining so long as said lease remained in force. . . .

"It would appear that in 1964 when the parties were trying to settle their differences, which culminated in the June 18, 1964, letter, the plaintiffs had two courses open, i.e. settle as they did or demand damages for the permanent loss of fertility of the 32.21 acres. They chose the former, apparently reasoning that as long as the partnership or its successors operated the lease they, the plaintiffs, could collect annual damages determined as agreed. The lease was terminated and defendants' obligation to pay under the June 18, 1964, agreement was also terminated. The letter agreement cannot stand alone as an interminable obligation of defendant."

We agree with the trial court. The evidence all shows that the salt water seepage in 1961 caused permanent damage to the land which cannot be remedied by any known methods; gypsum applied at the Laytons' expense in 1970 or 1971 proved ineffective in restoring its fertility. Monfort testified that he recognized the damage as permanent as soon as it occurred. The distinction between permanent damage to land and temporary damage to crops is well established in our case law. See, *e.g., Gowing v. McCandless,* 219 Kan. 140, 547 P.2d 338; *Henderson v. Talbott,* 175 Kan. 615, 266 P.2d 273; *Peterson v. Texas Co.,* 163 Kan. 671, 186 P.2d 259; and the numerous cases cited in each.

Plaintiff could have sued for the permanent damage to his land at any time within two years after it became apparent, under, *e.g.,* a negligence or nuisance theory. Instead, he elected to claim annual damage to his crops as it occurred. Defendants' obligation to make that kind of payment depended on contract, and specifically on the lessees' covenant to pay "for damages caused by [their] operation to growing crops." As the trial court found, the letter agreement calling for actual measurement of the loss each year merely implemented this covenant of the lease. The question

then becomes whether the covenant expired when the lease expired.

The parties offer us no authorities and no insight into this question; the Kansas cases we find are not directly in point. For example, in *Hiatt v. Natural Gas Co.,* 108 Kan. 472, 196 Pac. 448, a covenant to pay for damages to crops was held not to cover weight loss by cattle frightened and made nervous by the noise of defendant's operations in laying a pipeline, even though the ultimate result was to make plaintiff's grass crop valueless. And in *Berns v. Standish Pipe Line Co.,* 152 Kan. 453, 105 P.2d 893, a covenant to pay any damage to "pasturage" caused by laying a pipeline was held to cover the market value of the lost use of a pasture where plaintiff's cattle were prevented from full grazing and kept from water. While both cases suggest that a lessee's liability for incidental damages caused by its occupancy of the land depends on the terms of the lease, neither case deals with contractual liability for future losses caused by a permanent injury to the land. See also, *Wendtlandt v. National Cooperative Refining Ass'n,* 168 Kan. 619, 215 P.2d 209, where the lessee's liability for salt water pollution of the lessor's land was based on common law strict liability and our statute, K.S.A. (then G.S. 1935) 55-121; and *Duvanel v. Sinclair Refining Co.,* 170 Kan. 483, 227 P.2d 88, where it was held that in the absence of a covenant in the lease a lessee had no obligation to remove concrete structures or to restore the land to its pre-lease condition upon abandoning the lease. (But see, *Decker v. Jones,* 194 Kan. 146, 398 P.2d 325, dealing with a subsequently enacted statute on this subject.)

A closer analogy is afforded by *Fast v. Kahan,* 206 Kan. 682, 481 P.2d 958. There the lessors sued their lessee for damage to crops caused by the drilling of four wells, and also for the loss of thirty-six trees caused by escaping salt water. As to the first claim the court found that under a covenant similar to that in our present lease the lessors were required to prove "actual damages to growing crops resulting from the drilling of the four wells in question." (p. 686.) The fact that the lessee had paid $600 as agreed crop damage caused by drilling four earlier wells did not amount to an implied modification of the lease so as to provide for a fixed sum, and did not excuse proof of the new damages claimed. As to the tree loss, liability was predicated solely on negligence, as distinct from the crop damage provision of the

lease; the court's discussion on this point deals only with the several liability of members of an unincorporated association whose agents commit a tort. While the lines from which the salt water escaped were maintained by a producers' association, the water itself was from the lessee's wells and the resulting damage was, in the language of the lease covenant, "caused by its operations." The reason the covenant was not relied upon, it would seem, is that the trees were part of the realty rather than a growing crop, and the damage was therefore permanent damage to the land not covered by the covenant. See, *Eyman v. National Union Oil & Gas Co.,* 153 Kan. 45, 109 P.2d 477.

Under this reasoning the Laytons may have been obligated to pay for the loss of fertility in full when the damage first occurred, depending on proof of causation. Once that obligation had been met, however, plaintiffs could not have created a new crop damage action each year by planting on the damaged land, and then recovering again for the already anticipated poor yield. The parties, however, agreed to treat the damage as recurring crop damage and, as the trial court put it, "settle as they did."

In Texas we find a recent case strikingly similar to this one, *Phillips Petroleum Company v. Morris,* 518 S.W.2d 444 (Tex. Civ. App. 1975). There the lessee oil company drilled a dry hole, using 4.23 acres for its drilling site and an access road. No crop was growing during actual operations, but the land had previously been planted in milo and the crop harvested before drilling commenced. When the company abandoned its well it filled in the slush pits and broke up the roadway, but the productivity of the land had been lessened, some of it permanently and some temporarily. The plaintiff landowners sued on a lease covenant which provided:

"The Lessee agrees to pay for damages to crops or improvements caused by operations of Lessee." (p. 445.)

The trial court awarded damages for depreciation of the land permanently damaged and the rental value of the land temporarily damaged. On appeal the court noted:

"There is nothing in this case concerning negligence on Phillips' part, and there is nothing in the case concerning excess or unreasonable land use. Phillips' liability here exists by reason of paragraph 13 of the Oil, Gas and Mineral Lease of December 9, 1968, or it does not exist at all. [Citation omitted.]

"We find no Texas case defining the word 'crops' as used in the clause in

question. However, Texas courts have made a clear distinction between damage to crops and damage to the fertility of the soil, which in turn, results in a failure to produce or a reduction in production of future crops." (pp. 445-6.)

After discussing Texas cases which make the same distinction as do ours between crop damage and soil damage (or temporary damage and permanent damage), the court concluded:

"In the light of the foregoing authorities and the plain language of the contract itself, providing for damages to crops or improvements, we hold that lessee was not liable to lessors for the loss of anticipated future crops occasioned by damage to the soil as a result of the activities in question pursuant to Phillips' lease agreement with plaintiffs." (p. 446.)

The only case we find to the contrary is *The Illinois Pipe Line Co. v. Brosius,* 106 Ind. App. 390, 20 N.E.2d 195 (1939). There the defendant had agreed to pay "any damages which may arise to crops" from the laying of its pipeline across plaintiffs' land. The line was laid in February and March of 1929, when no crops were growing, but it damaged drainage tiles so that crops did not mature properly in each year from 1929 through 1932. Plaintiffs were allowed to recover crop damage for each of those years because first, the phrase "any damages" was found broad enough to encompass consequential as well as direct damages; and secondly, "[t]he parties employed the word 'crops' as used in its ordinary meaning and without any modification or reference as to the time of existence, so that the word might refer to any crop or crops." (p. 395.)

"If it were the intention of appellant to restrict its liability for damages to a particular crop, it should have been so stated when the contract was prepared. We think it sufficiently expressed in the language of the contract that appellant was to compensate appellees for damages to crops, whether such crops were growing at the time of the construction of the pipe line or were subsequently planted." (p. 396.)

Although we don't deem it of any particular significance, we note that in our lease the covenant is to pay simply "damages," not "any damages" or "all damages." Of more significance is our present lease language referring to damage to "growing" crops, signifying to our mind crops growing at the time of the operations causing the damage.

Under the rule of the Texas case the lease covenant here would not support the present action for "loss of anticipated future crops occasioned by damage to the soil" as a result of the lessees' actions. The covenant was to pay crop damage, not soil damage.

That would have been true even for losses during the term of the lease, were it not for the lessees' 1964 agreement to pay. That agreement in effect converted the permanent soil damage into annual crop damage; *i.e.,* the parties agreed to treat the soil damage *as if* it were crop damage caused by current operations, and hence covered by the covenant. By the agreement the lessees assumed an obligation under the lease to pay for damage to yet unplanted crops, and they make no complaint on appeal about the judgment holding them to that obligation.

We therefore hold that the trial court was right in concluding that the 1964 letter was part and parcel of the original lease, that it could not be construed as an interminable agreement binding the Laytons in perpetuity, and that when the lease expired so did the lessees' obligation to pay annual crop damage.

Affirmed.