Norman Lee SANFORD, d/b/a TTT Ranch, Appellant (Plaintiff),

v.

ARJAY OIL COMPANY, a foreign corporation, Appellee (Defendant).

ARJAY OIL COMPANY, a foreign corporation, Appellant (Defendant),

v.

Norman Lee SANFORD, d/b/a/ TTT Ranch, Appellee (Plaintiff).

Nos. 83–235, 83–236.

Supreme Court of Wyoming.

July 17, 1984.

Donald E. Chapin and Charles S. Chapin, of Crowell & Chapin, P.C., Casper, for Norman Lee Sanford.

John R. Perry, of Goddard & Perry, Buffalo; and Lawrence A. Yonkee, of Redle,

Yonkee & Arney, Sheridan, for Arjay Oil Company.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

ROSE, Justice.

This case concerns the correlative rights of the mineral lessee and the surface lessee to a particular tract of land. Norman Lee Sanford, as operator and manager of TTT Ranch, holds the right to graze livestock on 1,283.38 acres of land in Johnson and Natrona Counties. Arjay Oil Company (Arjay) leases and operates a number of oil-well sites on this acreage. In August, 1980, 75 head of Sanford's cattle ingested oil from various pits located on the leasehold. Sanford brought this action against Arjay to recover the value of the contaminated cattle, alleging that the loss resulted from Arjay's negligent maintenance of well sites and storage pits. The district court entered a default judgment against Arjay for failure to plead responsively. This judgment was subsequently set aside, and, following a trial without a jury, the court attributed liability to Arjay for the loss of 10 heifers. Damages were awarded to Sanford in the sum of $7,000. Sanford appeals the order of the court setting aside the default judgment and also challenges the court's refusal to award damages for 75 head of cattle. Arjay questions the sufficiency of the evidence to support a finding of liability for more than four heifers. We will affirm.

## FACTS

On the evening of August 22, 1980, Sanford drove 300 head of cattle onto the property which is subject to the parties' grazing and oil leases. The next morning approximately 75 head were discovered with oil on their faces and hides. Most of these animals had encountered oil in the unfenced depression or "yard pit" which Arjay used as a garbage dump for scrap metal, paper and other refuse. A small number of heifers were found in and around three settling ponds or pits located in the tank battery area and used by Arjay to gravitationally separate oil from water.

The source of the oil in the yard pit remained a mystery at trial. Arjay used the pit, located on an elevated portion of the property, exclusively as a refuse dump. Arjay president, Ronald Hollberg, testified that prior to the injury to the cattle, he had observed a mobile tank containing oil in the vicinity of the yard pit. He had directed John Gravalis, a pumper under contract with Arjay, to locate the owner of the tank for the purpose of removing it from the leased property. Gravalis never succeeded in discovering the owner, although the tank had disappeared by the time that Sanford's cattle ingested oil from the yard pit. Gravalis speculated at trial that the unknown owner had drained the oil from the tank into the yard pit to facilitate the tank's removal from the property.

The settling or separation ponds, unlike the yard pit, were designed for the storage of oil and were enclosed by a poorly maintained fence. On the morning of August 23rd, Sanford found three to four heifers within the fence surrounding the settling ponds and another 10 head in the vicinity of the ponds but outside the fence.

Sanford initiated this action against Arjay to recover $52,500, the asserted loss in market value of 75 contaminated cattle. Steven D. Luster, an attorney licensed to practice law in Utah but not in Wyoming, timely filed an answer and third-party complaint on behalf of Arjay. Both parties engaged in extensive discovery. The day before the scheduled pretrial conference, Sanford filed a motion for summary judgment, supported by affidavits affirming that Luster had no authority to practice law in Wyoming. When neither Luster nor any other representative of Arjay appeared at the pretrial conference, Sanford moved for the entry of a default judgment. The district court granted this motion on the ground that Arjay had failed to answer, since the pleadings filed in its behalf by Luster were void and of no effect in Wyoming courts.

After Sanford instituted garnishment proceedings, Arjay retained Wyoming counsel and moved the court to set aside the default judgment, as provided under the Wyoming Rules of Civil Procedure.[1] Counsel for both sides submitted memoranda on the motion and Arjay filed supporting affidavits from its president and from Steven Luster. Following a hearing, the district court granted Arjay's motion and entered an order vacating the default judgment. The order provides:

" * * * The motion having been argued and submitted and the Court having considered the record and the briefs of counsel and being advised in the premises, the Court finds:

\* \* \* \* \* \*

"2. That a Default Judgment generally in favor of Plaintiff and against Defendant, was entered in this action as a matter of course, and due to Defendant's protest against said Judgment through its Motion to Vacate the same, the Default Judgment entered on September 3, 1981, should be vacated."

Following trial, the court awarded Sanford $7,000 for the loss of 10 heifers discovered in the vicinity of the settling ponds. The court held that Arjay had breached its duty to properly maintain the fence enclosing these ponds and, therefore, was liable for the resulting injuries to the heifers. No damages were awarded for the loss of the cattle discovered in the unfenced yard pit. The court ruled that Sanford had failed to prove that Arjay's conduct either constituted a breach of duty or proximately caused the harm to these animals. Additional facts which are pertinent to this appeal will be developed during our discussion of the issues presented by the parties.

### ISSUES

Sanford presents the following issues for our consideration:

"1. Did the District Court exceed its statutory authority under Rule 60(b)

W.R.C.P. when it vacated the September 2, 1981 Default Judgment in favor of Appellant in the amount of its pleaded damages, Fifty-Two Thousand Five Hundred Dollars ($52,500.00), plus costs and interest.

"2. With the recognition that Appellee, Arjay Oil Company, and Appellant, rancher Sanford, each had a right to use of the lands for their respective purposes, did the Appellee have a duty to fence its oil pits used by or upon the leased property to protect Appellant's livestock from ingesting crude oil in the pits."

Arjay raises these issues in its brief:

1. "Did Arjay have a duty to maintain fences around the settling ponds at the tank battery?"

2. "Does the record support a finding by the Court that ten head of Sanford's cattle were injured in the settling ponds at the tank battery?"

During oral arguments, counsel for Arjay withdrew the first issue from our consideration. We will, therefore, respect Arjay's admission of liability and rule on the question of damages.

### VACATION OF DEFAULT JUDGMENT

The Wyoming Rules of Civil Procedure provide for the entry of a default judgment upon a party's failure to defend and for relief from such judgments under certain circumstances. Rule 55, W.R.C.P., specifies in part:

"(a) *Entry.*—When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter his default.

"(b) *Judgment.*—Judgment by default may be entered as follows:

"(1) By the Clerk.—When the plaintiff's claim against a defendant is for a sum certain, or for a sum which can by computation be made certain, the clerk

---

**1.** Rules 55(c) and 60(b), W.R.C.P., discussed infra.

upon request of the plaintiff and upon affidavit of the amount due shall enter judgment for that amount and costs against the defendant, if he has been defaulted for failure to appear and if he is not an infant or incompetent person;

"(2) By the Court.—In all other cases the party entitled to a judgment by default shall apply to the court therefor * * *. If the party against whom a judgment by default is sought has appeared in the action, he (or, if appearing by representative, his representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application. * * *

"(c) *Setting aside default.*—For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered may likewise set it aside in accordance with Rule 60(b)."

Rule 60(b), W.R.C.P., lists six reasons which justify a court in granting relief from a final judgment, including a default judgment:

"On motion, and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. * * * "

The disposition of a motion under Rule 60(b) comes within the sound discretion of the court. *Gifford v. Casper Neon Sign Co., Inc.*, Wyo., 639 P.2d 1385, 1386 (1982); *Atkins v. Household Finance Corporation of Casper, Wyoming*, Wyo., 581 P.2d 193, 195 (1978). Sanford recognizes this concept but contends that the trial judge in the instant case, instead of exercising his discretion, simply granted Arjay's motion as a matter of course. Sanford asserts that the court failed to address whether Arjay had established a basis for relief enumerated in Rule 60 (b), but treated the motion as though it created a right to have the judgment set aside. Therefore, according to Sanford, the trial court exceeded its authority under Rule 60(b), and the order vacating the default judgment is void.

Sanford bases his position upon an alleged ruling by the judge, not part of the record, that default judgments will be vacated as a matter of course when a party so moves. Sanford also cites the following language in the court order in support of his contention:

" * * * [D]ue to Defendant's protest against said Judgment through its Motion to Vacate the same, the Default Judgment entered on September 3, 1981, should be vacated."

We have held that a movant holds no absolute right to have a judgment vacated under Rule 60(b), but must show an exceptional circumstance specified in the rule. *McBride v. McBride*, Wyo., 598 P.2d 814, 816 (1979); *Booth v. Magee Carpet Company*, Wyo., 548 P.2d 1252, 1255 (1976). We cannot agree with Sanford, however, that the judge in the present case failed to make the threshold determination that Arjay's situation came within the enumerated grounds for relief or that he failed to exercise his discretion in ultimately granting relief.

In his order vacating the default judgment, the judge said that he considered the record, the briefs and the argument of counsel. He concluded that "due to Defendant's protest" the judgment should be

vacated. The protest, described in Arjay's memorandum to the trial court and supported by affidavits, provides ample justification for relief under Rule 60(b).

 The record shows that Sanford failed to serve Arjay with written notice of the application for judgment as mandated by Rule 55(b)(2), supra, when a defaulting party "has appeared in the action." A party will be deemed to have appeared in the action, even though no formal pleadings have been entered, when contacts between the parties clearly demonstrate an intent to defend. The defaulting party in such cases is entitled to rely on the notice requirements of Rule 55(b)(2). *Booth v. Magee Carpet Company*, supra, 548 P.2d at 1254; *Collex, Inc. v. Walsh*, 74 F.R.D. 443, 446 (E.D.Pa. 1977); *H.F. Livermore Corporation v. Aktiengesellschaft Gebruder Loepfe*, 139 A.D.C. 256, 432 F.2d 689, 691 (D.C.Cir.1970).[2]

 In the instant case, Arjay manifested its intent to defend by filing responsive pleadings through Utah counsel, engaging in extensive discovery and stipulating to Sanford's amended complaint. This evidence of participation in the lawsuit, which was considered by the district judge, compels the conclusion that Arjay was entitled to notice of the pending default judgment. Failure to serve notice under Rule 55(b)(2) has been held to constitute justification for vacating a default judgment under Rule 60(b)(6), *Collex, Inc. v. Walsh*, supra, 74 F.R.D. at 447–448, and under Rule 60(b)(4), *Sonus Corporation v. Matsushita Electric Industrial Company, Ltd.*, 61 F.R.D. 644 (1974).

The judge in the present case also considered affidavits attesting to the unorthodox behavior of Steven Luster, counsel for Arjay. Luster had represented Arjay satisfactorily in previous matters and initially had proceeded competently in this case. He unexpectedly failed to appear at the pretrial conference and failed to notify his client of the default judgment. By the time that officers for Arjay discovered the situation, Luster could not be located. Arjay brought a civil action to gain access to its files.

 Relief is available under Rule 60(b)(6) when the personal problems or psychological disorders of an attorney cause him to neglect a case to the extent that a default or summary judgment is entered against the unsuspecting client. *L.P. Steuart, Inc. v. Matthews*, 117 A.D.C. 279, 329 F.2d 234 (D.C.Cir.1964), cert. denied 379 U.S. 824, 85 S.Ct. 50, 13 L.Ed.2d 35; *United States v. Cirami*, 563 F.2d 26 (2nd Cir. 1977). The evidence before the judge in the instant case suggests that such distractions culminated in the entry of the default judgment against Arjay.

 Given the ample justification in the record for setting aside a default judgment pursuant to Rule 60(b), we conclude that the court did not exceed its authority in ruling that the outcome of this case should depend upon the merits.

## DUTY TO FENCE AGAINST HARM

Sanford contends that Arjay is liable in damages for those heifers injured in the yard pit, because Arjay violated its duty to fence this pit unessential to its oil drilling operations. The trial court, in denying recovery for any harm emanating from the oil in the yard pit, ruled that Sanford had failed to prove either that Arjay owed a duty to fence that area or that any action or inaction by Arjay proximately caused the harm. At the conclusion of the trial, the court said:

" * * * There appears to be no explanation for the oil in the yard pit. Perhaps it came from the tank. In any event, there appears to be no way to impute or determine negligence on behalf of the defendant as to the oil in the yard pit."

The final judgment provides:

"II.

" * * * In the yard area there was an abandoned pit which probably had been

---

**2.** The relevant provisions of Rules 55(b)(2) and 60(b), W.R.C.P., are identical to their federal counterparts; therefore, authority interpreting the federal rules aids our application of the Wyoming rules. *Hicklin v. State*, Wyo., 535 P.2d 743, 748 (1975).

constructed by a prior owner of the lease for drilling or production of oil. Since the Defendant acquired the lease, the pit was used as a dump for scrap metal and other refuse. The Defendant has not used the pit to store or hold oil. The equipment yard was not fenced on or before August 22, 1980.

\* \* \* \* \* \*

"VI.

"There appears to be no explanation for the oil in the yard pit. It may have come from a storage tank on the premises not claimed by Defendant.

\* \* \* \* \* \*

"IX.

"Additional cattle were exposed to oil at the pit in the equipment yard; however, Plaintiff failed to prove that Defendant was causally negligent for any injury to Plaintiff's cattle from consuming oil at that location. The Plaintiff failed to prove that Defendant had a duty to fence the area referred to as the 'yard pit.'"

■ This state adheres to the common-law rule that a landowner owes no duty to fence out or against the livestock of another, in the absence of a contract or statute imposing such duty or unless the duty has arisen by prescription. *Garretson v. Avery*, 26 Wyo. 53, 176 P. 433, 434 (1918). We have said that a landowner is under no obligation to protect wandering livestock from harm:

"\* \* \* [A]s a general rule, where no obligation rests upon a landowner to fence out another's live stock, or to prevent them from straying or entering upon his land, 'the owner of uninclosed lands is under no duty to make or keep them in safe condition for stock straying thereon.'" 176 P. at 434, quoting from *Gillespie v. Wheatland Industrial Co.*, 22 Wyo. 331, 140 P. 832 (1914).

In the present case, we are asked to apply the rule of *Garretson v. Avery* to a single parcel of land subject to possession by two diverse users—the grazing lessee and the oil lessee. The question arises as to whether Arjay, as the oil lessee, held an exclusive right to possess any portion of the surface of the leasehold. If so, no duty to fence these areas would exist, under our holding in *Garretson v. Avery*, supra.

■ Under the rule of reasonable necessity, a mineral lessee is entitled to possess that portion of the surface estate "reasonably necessary" to the production and storage of the mineral:

"\* \* \* 'The true rule is that under the ordinary oil and gas lease, the lessee, in developing the premises in the production of oil and gas, is entitled to the possession and use of all that part of the leased premises which is reasonably necessary in producing and saving the oil and gas. This extends to space required upon which to erect tanks or dig pits necessary to store or confine such refuse matter as may come from the wells on the leased premises in the course of ordinary prudent operations. \* \* \*'" *Pure Oil Co. v. Gear*, 183 Okl. 489, 83 P.2d 389, 392 (1938), quoting from *Magnolia Petroleum Co. v. Howard*, 182 Okl. 101, 77 P.2d 18, 20 (1938).

This rule aids the mineral lessee where the injured party charges the lessee with ordinary negligence in failing to erect barriers around ditches and ponds necessary to the production of the mineral. 83 P.2d at 393. Sanford relies on this rule, in making his argument that Arjay had a duty to fence the yard pit, contending that the pit was not necessary to Arjay's oil-drilling operations. Sanford argues that Arjay maintained an unfenced hazard on a part of the surface area subject only to grazing rights and, therefore, must be found liable for the livestock injured by that hazard.

■ We have held that the extent of surface area required for all purposes reasonably incident to mining and removal of oil and gas is a question of fact to be determined at trial. *Holbrook v. Continental Oil Company*, 73 Wyo. 321, 278 P.2d 798 (1955). Whether and when a use is reasonably necessary to the lessee's operations are also questions for the fact

finder. *Lanahan v. Myers*, Okl., 389 P.2d 92 (1964).

Sanford argues vigorously, with references to supporting case law, that Arjay's use of the yard pit as a depository for rubbish was not reasonably necessary to the production and storage of oil. We need not concern ourselves, however, with the sufficiency of the evidence in support of the factual findings necessary to the trial court's holding that Arjay owed no duty to fence the yard pit. Our resolution of this appeal will turn on the trial court's determination that Arjay's failure to fence the pit was not the proximate cause of the injury to the cattle.

■ The uncontroverted testimony at trial established that Arjay never deposited oil in the yard pit. The parties could only speculate as to the source of the oil encountered by Sanford's cattle in August, 1980. We agree that but for the failure to fence, the injury might not have occurred. This fact does not determine liability, however, since the law charges a person only with that harm proximately caused by his act or omission to act.

We discussed the distinction between remote and proximate causation in *Kopriva v. Union Pacific Railroad Company*, Wyo., 592 P.2d 711, 713 (1979):

" * * * The law does not charge a person with all the consequences of a wrongful act but ignores remote causes and looks only to the proximate cause. In *Lemos v. Madden*, 28 Wyo. 1, 10, 200 P. 791, 793 (1921) Justice Blume defined the issue as follows:

" 'The proximate cause of an injury is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred.'

"Later in the case, 28 Wyo. at 12, 200 P. at 794, Justice Blume rejected the notion of 'but for' causation and stated:

" 'But if the original wrong furnished only the condition or occasion, then it is the remote and not the proximate cause, notwithstanding the fact that there would have been no loss or injury but for such condition or occasion.' "

We said that a condition could not be the proximate cause of an injury if no danger existed in the condition unless acted upon by independent forces. 592 P.2d at 713, quoting from 65 C.J.S. Negligence § 111(4), pp. 1213–1216. We recently reaffirmed this reasoning in *Robertson v. TWP, Inc.*, Wyo., 656 P.2d 547 (1983). See also Restatement, Second, Torts § 433(b).

■ The failure of Arjay to enclose the yard pit with a fence or other barrier furnished only the condition for the injury to Sanford's cattle. This pit, containing assorted debris, was relatively harmless until contaminated with oil by unknown third persons, independent of Arjay. Arjay's conduct, therefore, constituted the remote rather than the proximate cause of harm, and no liability can be recognized for those heifers injured in the yard pit.

With respect to the three settling or separation ponds at the tank battery, the trial court determined that Arjay, having undertaken to erect fencing, assumed an obligation to maintain it. The judgment provides:

"The Defendant undertook to fence the open pits at the battery site and under the circumstances had a duty to exercise ordinary care to maintain the fence, which Defendant failed to do and as a result, the Plaintiff lost the value of ten two-year old heifers, and Plaintiff was thereby damaged in the amount of $7,000.00."

At oral argument Arjay abandoned its challenge of the court's finding of liability based on a duty to maintain adequate fencing around the settling ponds. While we may not agree with Arjay that liability exists, nevertheless that is the posture in which we find this appeal according to Arjay's own admission.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE DAMAGES AWARD

The trial judge found that Sanford lost the value of 10 head of cattle as a result of Arjay's failure to maintain adequate fenc-

ing around the settling ponds. Arjay contends that the evidence supports a finding that a maximum of four heifers were injured in this area.

As an appellate court, we properly accord considerable weight to a finding of fact made by the trial court:

> "When specific findings of fact are made by the trial court on evidentiary matters, they are presumed correct; an appellate court will not disturb them unless they are clearly erroneous or against the great weight of the evidence. The review standard recognizes that deference must be given to the opportunity of the trial court to judge the credibility of the witnesses, and that a reviewing court will not set aside the court's findings merely because it might have reached a different result. * * * " *Doenz v. Garber*, Wyo., 665 P.2d 932, 936–937 (1983).

The only evidence in this case of the number of heifers injured in the separation ponds comes from the testimony of Sanford. Upon direct examination, he testified as follows:

> "A [By Sanford] * * * I drove down in the battery—not slowly—and found there were cows in lower battery pits also.
>
> "Q [By Chapin] How many did you see down there?
>
> "A Well, there were three or four in there when I got there, but there were some around the battery flat area there.
>
> "Q Did they appear to have oil on them?
>
> "A I was worried about getting John and getting those ones out of the fenced-in area, and I don't remember what they looked like until I got horseback and moved them to the fence line.
>
> * * * * * *
>
> "Q How many heifers were there that you moved from the battery area?
>
> "A There were three or four that we kicked out of there and maybe ten that we kicked out of the tank battery area.
>
> "Q What did you do with that collection of heifers?
>
> "A I kicked them towards the fence line and we grabbed the heifers on top, we trailed them down the fence line.
>
> "Q How far was it from where you got them out of the tank battery to the fence line, as you say?
>
> "A Well, it was across the draw, 200 yards.
>
> "Q Did all of the cattle—or, how many, I should say, of the cattle that you got out of the tank battery area had been oiled?
>
> "A Well, they had been drinking, the ones I kicked out, but they weren't as oily you know, they didn't have it all over their bodies. They just had it on their noses.
>
> "Q Each one of them?
>
> "A Yes.
>
> "Q As you kicked the cattle, as you say, up towards the fence, where were the cattle that had come from the yard pit area?
>
> "A They were coming down with the boys to meet these cows.
>
> "Q Did you have some purpose or plan at that time with what you were going to do?
>
> "A I was getting them out of the area. I kicked 300 head in there, and I didn't know if all 300 hadn't been in all the oil around there.
>
> "Q Were you able to determine how many cattle had been oiled at that time that morning?
>
> "A When we got over towards the fence line and down towards the river, I got a fence-line count of about 75.
>
> "Q Did you personally see whether each one of them had oil on them or had been oiled?
>
> "A Right. The oil—I'm getting to be an expert on it now—oil stays on the cow for a long time. I had—I watched these cows and still find the oily coats all through the winter, the ones that lived.

"Q On that day, did you take any more cattle down to the river than the 75 you had seen that were oiled?

"A No. The cattle that were spread out in the different draws, we rode over and looked and didn't see any oil on them but you see five head here and three head there. We didn't gather the whole pasture."

Cross-examination elicited the following:

"Q [By Yonkee] There were three or four cows that were inside the fence?

"A Yes.

"Q Which was sagging down there.

"A Yes, sir.

"Q And then there were some other cows—where were they? Were they up on the flats above the battery?

"A Yes. The battery had a little area there and there was—

"Q You saw the cows, the three or four that you got out of the battery had oil on their noses?

"A Yes.

"Q And you didn't have an opportunity to look at the other cows?

"A I just kicked them towards the draw that we trailed two days in a row.

"Q And that's the last you saw them?

"A Until I went and got my cowhorse and moved them."

■ Sanford testified that he removed three or four heifers from the fenced portion of the tank battery and an additional ten head from the surrounding area. He said that he herded these heifers to the fence line, where he observed oil on each of them. His testimony supports a finding that as many as 14 head of cattle were injured by the oil in the ponds in the tank battery. The award of damages for the loss of 10 heifers is within the range of proof and will not be disturbed on appeal. *Landmark, Inc. v. Stockmen's Bank & Trust Co.*, Wyo., 680 P.2d 471, 477 (1984).

The judgment of the district court is affirmed.