MINGO OIL PRODUCERS, a Wyoming corporation and Nupetco Associates, a Utah limited partnership, Appellants (Plaintiffs),

v.

KAMP CATTLE COMPANY, a Wyoming corporation, Appellee (Defendant).

No. 88–322.

Supreme Court of Wyoming.

June 29, 1989.

K.W. Keldsen, Rawlins, for appellants (plaintiffs).

Kermit C. Brown and William L. Hiser of Brown & Erickson, Rawlins, for appellee (defendant).

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

URBIGKIT, Justice.

We consider an oil lease right-of-entry controversy complicated by a subsequent dollar payment modification agreement as an annual land use rental for access roads and well sites. Mingo Oil Producers (Mingo Oil), lessee, denied access to the leasehold "to conduct its oil and gas production, exploration and drilling operations," sued Kamp Cattle Company (Kamp Cattle), surface landowner, to establish access and recover damages. We reverse the judgment entered in favor of the landowner.

## FACTS

Although this case started with two typical standard form oil and gas leases (Producers 88 style), the factual developments thereafter become complicated.[1] Kamp Cattle, appellee, owned the surface and a fifty percent mineral estate. It and the

___

1. The lease provided as right to access that Kamp Cattle

grants, leases and lets exclusively unto lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas, casinghead gas, and all other minerals (but not gravel), laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport, and own said products, and housing its employees, [for the lands described in the lease].

Additionally, one of the two oil and gas leases in question contained a one sentence provision regarding surface damages, which stated that "Lessee shall pay for damages caused by its operations ~~to growing crops~~ on said land." The

other lessor, lacking surface interest, did not have the three words deleted. At the time of acquisition by the present lessee, the leases involved a developed oil field (Overland Dome Oil Field). The original 1979 leases had a two-and-one-half-year delay rental term. Mingo Oil acquired the field from a bankruptcy sale. The file reflects that similar surface agreements as were subsequently executed with Mingo Oil may have existed with predecessor developers. At the time of this litigation, it is indicated that a field production, when operational, of between seventy and one hundred barrels per month existed. Photographs of the tanks and drilling equipment suggest a long period of disuse or neglect. This was obviously a marginal oil production property.

other mineral interest owner had executed the base leases in 1979 to another entity, which leasehold rights were more recently acquired by Mingo Oil, appellant. Upon receipt of the assignment of the oil and gas leases in March 1984, Mingo Oil attempted to enter on the premises for production resumption and pumping operation and was immediately denied access by Kamp Cattle. Thereafter in April 1985, a written surface owner's access agreement was first executed, which provided in part:

1. Kamp agrees to allow Mingo to operate the existing oil and gas wells and to drill for oil on that certain land owned by Kamp. Said land is designated as follows:

All of Section 18, excluding Lot 4, in Township 20 North Range 83 West of the 6th P.M., in Carbon County, Wyoming.

2. Mingo agrees that during the production and prior to drilling on said land, it will build and maintain proper fences, which will include gates rather than cattle guards, on areas of ingress and site location in order to protect Kamp's cattle.

3. Mingo agrees to promptly level, reclaim and reseed said drilling site at the termination of drilling. Said leveling[,] reclaiming and reseeding to be done by Mingo to the reasonable specifications as required by Kamp.

4. At the time drilling is commenced, or production recommenced, Mingo shall pay to the Kamp people the sum of $400.00 per acre per year for actual surface used to include a minimum of one acre per production site and roads to and from production sites.

5. In the event oil and/or gas is discovered[,] Mingo agrees to pay a surface lease of $400.00 per acre per year for actual surface used, to include a minimum of one acre per production site and roads (a minimum of twelve feet in width) to production sites. This payment to be made until such time as the 12½% mineral owners royalty equals or exceeds such lease payment for said production site.

6. Mingo agrees to keep all locations free from trash and to construct a pit for that purpose.

7. Mingo will post a surety bond equal to $400.00 per year per acre used as determined by a registered surveyor to insure the payment of the yearly rental provided for hereunder. Upon the execution of this agreement, Mingo will post a $10,000.00 bond as an interim measure pending the completion of the survey which will be released upon the posting of the final bond.

Unfortunately, Mingo Oil was unable to secure the required bond and Kamp Cattle denied its alternative proposal to substitute a letter of credit. Thus, after about one month of occupancy, Mingo Oil was again ordered off the land in June 1985, until another agreement, as a supplemental agreement dated September 11, 1985, was executed which creates the documentary questions now presented:

WHEREAS, on April 15, 1985, Kamp and Mingo entered into surface owner's agreement whereby Mingo was given the right to enter upon and conduct exploration and drilling operations for oil and gas on the hereinafter described land of Kamp and whereby Mingo agreed to pay to Kamp the sum of $400.00 per acre per year for actual surface used to include a minimum of one acre per production site and roads to and from production site; said land being described as Section 18, excluding Lot 4, in Township 20 North, Range 83 West of the 6th P.M., in Carbon County, Wyoming; and

WHEREAS, Mingo and Kamp have agreed in the event that there is production of oil or gas on said properties and royalties payable to Kamp that Mingo shall be reimbursed for surface rentals paid out of royalties payable to Kamp; and

WHEREAS, Kamp desires that the surface use payments due to Kamp be payable in advance[ ] based upon an estimate of acreage of land anticipated to be used and Mingo is willing to make such advance payment; and

WHEREAS, it is anticipated that the total acreage used for roads and site locations will be 17.816 acres, which, at $400.00 per acre, computes to the amount of $7,126.40 for a one year period; and

WHEREAS, Mingo has been allowed access to and upon the aforesaid property only one month since April 15, 1985, and since that time has been denied access to and upon said property and the advance payment of this rental will be for one month already used and 11 months after the execution of this Supplemental Agreement; and

WHEREAS, Kamp has agreed to give to Mingo an Assignment of Oil and Gas Royalty payments due to Kamp from Sinclair Oil Co. up to $7,126.40.

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter to be kept by the parties hereto, it is mutually agreed as follows:

1. That upon the execution and delivery of this Supplemental Agreement, Mingo shall pay to Kamp the sum of $7,126.40 advance payment of surface use rentals for a period of one year actual use of the hereinabove described real property.

2. Kamp hereby grants to Mingo the right to enter upon the above-described land of Kamp to explore and drill for oil and gas in accordance with the previous agreement of the parties.

3. Kamp shall give to Mingo a good and sufficient assignment of all of his oil and gas royalty payments due to Kamp from oil and gas produced and sold from said property addressed to Sinclair Oil Corporation, 550 East South Temple, P.O. Box 31825, Salt Lake City, Utah 84131, or any other purchaser of oil and gas products produced from said lands, up to, but not exceeding the sum of $7,126.40 out of the first production of oil and gas from said land.

4. At the end of twelve months of actual use of said lands Mingo and Kamp will have an accounting of acreage actually used for said period of time and the amounts due for such use under the previous agreement between the parties and the appropriate payment or reimbursement will be made.

Pursuant to these agreement terms, Kamp Cattle was paid $7,126.40 and apparently executed an assignment of royalty interest so that its royalty rights, from whatever production, would be paid to Mingo Oil for damage deposit credit.

In February 1987, Kamp Cattle again evicted Mingo Oil from the premises by written letter reciting failure to account for additional acreage during the initial one year and failure to make arrangements thereafter for a continuing second year payment. This lawsuit followed by Mingo Oil to seek both right of future access and damage from loss of discontinued production since February 1987.

## ISSUE

Mingo Oil phrases its appellate issue based on a denied right of access provided by the terms of the original leases. Kamp Cattle responds in questioning whether the oil and gas leases are still in effect and, if so, whether the two modification agreements were binding on Mingo Oil as controlling in utilization of access for production.

## DISCUSSION

The trial court did not receive evidence, consider or decide whether the leases remained in effect and, in the absence of any decision by the trial court, we will not pursue that controversy here.[2] The finite decision made by the trial court was that the two access agreements "extended be-

---

**2.** It is obvious that if the leases are in effect, they are held by production. Clearly, production has not occurred during the period of time when Mingo Oil has been denied access. Assuming for the purpose of this appeal, the leases remain in effect or, otherwise, nothing exists to litigate. Kamp Cattle had no direct knowledge of production since its royalty interest had been assigned by the modification agreement. Evidence of production was provided at trial for the period when access had been permitted.

yond the one-year period and controlled the actions of the parties beyond the one-year provision set forth in the supplemental agreement." We do not agree and consequently reverse.

In order to reach that conclusion, an understanding of the status of the parties is required. In original terms of the oil and gas lease, Mingo Oil is granted on the described property an unqualified right of access for

> the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas, casinghead gas and all other minerals (but not gravel), laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport, and own said products, and housing its employees, * * *.

The reserved or retained right for Kamp Cattle was that "Lessee shall pay for damages caused by its operations * * * on said land."

■ The argument that Kamp Cattle can force an access damage agreement before granting an initial right of access under the lease has a significant history in litigation. The countervailing contention that such a "forced agreement" is without consideration is also not novel. In order to establish the confines within which an analysis of the access agreement can properly be made, we determine that (1) Kamp Cattle cannot require the execution of agreement before access is permitted;[3] and (2) the validity of any access agreement, executed for whatever reason, goodwill, liquidation of damage amount, avoidance of litigation or otherwise, need not and will not be decided in this decision.[4]

---

**3.** Representative analysis covering contract and tort and the do's and don'ts from the perspective of both mineral estate and surface owner include: Bennett, *Damages to the Landowner Following the Oil and Gas Lease*, 13 S.D.L.Rev. 29 (1968); Browder, *The Dominant Oil and Gas Estate—Master or Servant of the Servient Estate*, 17 S.W.L.J. 25 (1963); Castleberry, *Protecting the Oil and Gas Lessor*, 30 Rocky Mtn.L.Rev. 441 (1958); Davis, *Selected Problems Regarding Lessee's Rights and Obligations to the Surface Owner*, 8 Rocky Mtn.Min.L.Inst. 315 (1963); Dye, *Special Problems of the Farmer as an Oil and Gas Lessor*, 11 Kansas L.Rev. 343 (1963); Healy, *Rights of Mineral Owners in Surface*, 1 Rocky Mtn.Min.L.Inst. 85 (1955); Jones, *The Oil Operator and Surface Damages*, 4 Nat. Resources Law. 339 (1971); Keeton and Jones, *Tort Liability and the Oil and Gas Industry II*, 39 Tex.L.Rev. 253 (1961); Keeton and Jones, *Tort Liability and the Oil and Gas Industry*, 35 Tex.L.Rev. 1 (1956); Lambert, *Surface Rights of the Oil and Gas Lessee*, 11 Okla.L.Rev. 373 (1958); Moses, *Peaceful Coexistence Between Lessor and Lessee Under an Oil and Gas Lease*, 38 Tul.L.Rev. 341 (1964); Scott, *Oil and Gas Lease Clauses Relating to Surface Damage and Use of the Surface*, 13 Rocky Mtn.Min.L.Inst. 317 (1967); Sellers, *How Dominant is the Dominant Estate? Or, Surface Damages Revisited*, 13 Inst. on Oil & Gas L. & Tax'n 377 (1962); Comment, *Land Uses Permitted an Oil and Gas Lessee*, 37 Tex.L.Rev. 889 (1959); and Recent Decision, *Oil and Gas—Rights of Surface and Mineral Owners*, 7 Baylor L.Rev. 188 (1955). *See also* Annotation, *What Constitutes Reasonably Necessary Use of the Surface of the Leasehold by a Mineral Owner, Lessee, or Driller Under an Oil and Gas Lease or Drilling Contract*, 53 A.L.R.3d 16 (1973) and cases and other annotations cited therein.

**4.** The validity of the forced agreement for access has encountered a varied response. Legitimate authority has rejected the effectiveness of such agreements on basis of lack of consideration and statute of frauds. *See Phillips Petroleum Co. v. Cargill,* 340 S.W.2d 877 (Tex.App. 1960); *Miami Petroleum Co. v. Neal,* 333 S.W.2d 876 (Tex.App.1960); and *Chapapas v. Delhi–Taylor Oil Corp.,* 323 S.W.2d 64 (Tex.App.1959). *Cf. Black Gold Petroleum Co. v. Hill,* 188 Okl. 329, 108 P.2d 784 (1940) (invalidate the intended agreement for lack of consideration) and *Union Producing Company v. Allen,* 297 S.W.2d 867 (Tex.App.1957). As similar in result, see *Livingston v. Indian Territory Illuminating Oil Co.,* 91 F.2d 833 (10th Cir.1937). Countervailing authority can also be found which tends to validate the agreement in the modern conception of compromise and settlement: *Smith v. Minneapolis Threshing Mach. Co.,* 89 Okl. 156, 214 P. 178 (1923); *State ex rel. West v. City of Sapulpa,* 160 P. 489 (Okl.1916) and 15A C.J.S. *Compromise and Settlement* § 11 at 202 (1967).

We will not invade this broad and pervasive field of accord and satisfaction, compromise and settlement by virtue of the decision which we make, which renders the question of initial validity of the agreement unnecessary for present disposition of this appeal. *See Willard Given & Associates, P.C. v. First Wyoming Bank–East Cheyenne,* 706 P.2d 247 (Wyo.1985); *Greaser v. Williams,* 703 P.2d 327 (Wyo.1985); *Miller v. Miller,* 664 P.2d 39 (Wyo.1983); *Dame v. Mileski,* 80 Wyo. 156, 340 P.2d 205 (1959); *Casper Nat. Bank v. Woodin,* 68 Wyo. 232, 232 P.2d 706 (1951); and *City of Rawlins v. Jungquist,* 16 Wyo. 403, 94 P. 464 (1907).

We need not reach beyond what the parties attempted to accomplish by the access agreement. In obvious effort to quantify and liquidate the access damage rights, the two agreements were willingly executed. Since we hold that the right of access was primary and fundamental, we will not extend a liquidating damage provision beyond its specified term of one year. Differing from the trial court, we do not find that any provision of the supplemental agreement defining surface use rental and lease right damage extends beyond that period.

When Mingo Oil was unable to post the surety bond as required by the April 1985 agreement and Kamp Cattle was unwilling to accept the letter of credit as a substitute, the first agreement ended by notice and Kamp Cattle's exclusion of Mingo Oil from its operation of the oil field property. The access agreement was reinstated by the September 11, 1985 amendment, but only for the one-year period. Without any agreement, Mingo Oil already had the right, as a function of its dominant estate, to possession provided by the oil and gas lease.[5]

The dominant structure of rights provided for exploration, development and production under oil and gas leases is abraded by the surface owner's right to have reasonable use exercised and to recover for lease provided damages. This matter has been the subject for substantial litigation and extensive scholarly review in text and law journals. In general principle, the attributory status rests with the holder of the mineral estate in a priority right to develop and a correlative obligation derived from both precedent and lease contract to be reasonable in use and respond in damages as defined by that contract or required within tort law concepts.[6] *Sanford v. Arjay Oil Co.*, 686 P.2d 566 (Wyo.1984); *Holbrook v. Continental Oil Co.*, 73 Wyo. 321, 278 P.2d 798 (1955); *Kinney–Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961 (1928).

A widely quoted and delightfully realistic and perspicacious analysis of the status of surface owner versus mineral-right lessee is provided by now United States District Judge Clarence A. Brimmer in *The Rancher's Subservient Surface Estate*, V Land & Water L.Rev. 49 (1970).[7] See also other

---

5. Although we obviously will not determine the issue in this case, it appears that the rights of Kamp Cattle, if the access agreement was both valid and continuing, could have been only to sue for the agreed annual liquidated damages and not to deny Mingo Oil access. Neither litigant briefed this question which would require analysis of the leases as well as successive documents. *Did Mingo Oil* in access agreements bargain away *its* lease established rights for access as the holder of the dominant estate unless it paid annual "rental" or did it agree to make stated payments in lieu of damage claims?

6. Judge T. Blake Kennedy of the United States District Court for Wyoming stated in an unreported Wyoming case:

"This is a case in which it appears that it is not so much a controversy between wrong and right as it is between two rights. Plaintiffs had the right to have the protection of their surface of which they were the owners against unnecessary damage to those rights by the defendant in carrying on its oil operations. On the other hand, the defendant undoubtedly had the right to enter upon the land, using reasonable means to exploit its mineral possibilities."

Healy, *supra* n. 3, 1 Rocky Mtn. Min.L.Inst. at 101–02 (quoting *Livingston v. The Texas Co.*, Unreported (D.C.Wyo.1951)).

7. Judge Brimmer's conceptualization provides definition for the surface owner conflicts:

Ranchers and farmers—almost by definition, if not by some obscure oath of allegiance to the local county farm bureau—have a sure and certain faith that a printed form entitled "Producers 88" is a timer-tested, honorable document that almost any prudent person would quickly sign on the tailgate of the pickup, in the hope that either development will lead to the pot at the end of the rainbow or that at least the annual lease rentals will defray the taxes. All too seldom is the family lawyer asked to participate in the negotiation of the oil lease, and frequently he only learns of his client's problems when the lessee's development has started and his client now tells him that a big well-site is in the middle of his best field, staked out by engineers, not farmers, in the dead of winter, taking far more land than reasonably required, that the newly constructed roads for heavy equipment are dividing the field so that the mowers will have trouble, that the roads will create low spots in which water will collect and sour the meadows, and will alter his irrigation pattern, that the culverts in the road will plug and necessitate annual cleaning, that the surface water where confined by culverts will wash away topsoil, that fences will have to be built to keep cattle out of the mud pits, that the lessee is

Wyoming law reviews: Thompson, *Surface Damages—Claims by Surface Estate Owner Against Mineral Estate Owner,* 14 Wyo.L.J. 99 (1960) and Note, *Surface Damage Under a Federal Oil and Gas Lease,* 11 Wyo.L.J. 116 (1957).

The case law is reasonably consistent with a degree of shading from Texas which follows a heavy persuasion favoring the lessee to other jurisdictions where a somewhat more liberalized adaptation for the surface owner might be perceived. The rule, however, remains constant in theory of law and lease document interpretation that the mineral estate is dominant. One of the early foundational cases came from the Wyoming Salt Creek oil field and ended in the United States Supreme Court in *Kinney–Coastal Oil Co.,* 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961. In that case, lessee was granted an injunction to prevent occupancy and use of the surface for a townsite until oil and gas production had been completed. Well spacing was not then in existence.[8] *Sussex Land & Live Stock Co. v. Midwest Refining Co.,* 294 F. 597 (8th Cir.1923) similarly involved lessee conflict with surface owner and claimed surface damage in the area.

This court has had a minimum of appellate litigation, but the dominance of the mineral estate is determined. *Sanford,* 686 P.2d 566; *Holbrook,* 278 P.2d 798. *See also Vest v. Exxon Corp.,* 752 F.2d 959 (5th Cir.1985); *Monfort v. Layton,* 1 Kan. App.2d 622, 571 P.2d 80 (1977); *Pure Oil Co. v. Gear,* 183 Okl. 489, 83 P.2d 389 (1938); and *Marland Oil Co. of Oklahoma v. Hubbard,* 168 Okl. 518, 34 P.2d 278 (1934). *Cf. Fowler v. Delaplain,* 79 Ohio St. 279, 87 N.E. 260 (1909).

We stated in *Sanford,* 686 P.2d at 572, that:

> Under the rule of reasonable necessity, a mineral lessee is entitled to possess that portion of the surface estate "reasonably necessary" to the production and storage of the mineral:
>
> " * * * 'The true rule is that under the ordinary oil and gas lease, the lessee, in developing the premises in the production of oil and gas, is entitled to the possession and use of all that part of the leased premises which is reasonably necessary in producing and saving the oil and gas. This extends to space required upon which to erect tanks or dig pits necessary to store or confine such refuse matter as may come from the wells on the leased premises in the course of ordinary prudent operations. * * * ' " *Pure Oil Co. v. Gear,* 183 Okl. 489, 83 P.2d 389, 392 (1938), quot-

---

using all the water that is now needed for crops or livestock, and finally, that he has tried to find someone to talk to about it but that he missed the landman who has now returned to the home office and is on vacation for a couple of weeks.

It is also axiomatic that the severity of these problems grows in an inverse proportion to the amount of mineral interest which the rancher has in the leased premises. If snow drifts are high, cattle prices unsteady and the rancher client has a full one-eighth reserved royalty, and the driller also told him that morning in the restaurant that this was a great oil prospect, dreams of a luxurious retirement in a sunnier clime will surely ameliorate the crisis; but, if the meadows were wet and now badly rutted, and his mineral interest is nil anyway, then quicker than can be muttered "Application for Temporary Injunction," the client will demand the balm of instant legal redress and damages as an alternative to his itchy shotgun trigger finger. Brimmer, *supra,* V Land & Water L.Rev. at 50. He further related:

> In explaining the relative rights of the surface owner and the mineral lessee, it seldom soothes the rancher's ruffled feathers to observe, audi-

bly at least, that the lease's printed form contains many provisions, ordinarily negotiable, which could have been modified or eliminated by a timely legal consultation at its inception. But, if the inequalities unwittingly created by hasty execution of such documents are disturbing, this is to say nothing of the appalling practical inequality of the negotiators who produced the situation. On the one hand is an urbane, diplomatic landman, well schooled in the details of his lease form and versed in his petroleum landman's handbook, who is the product of a hundred negotiating sessions this year; and on the other hand is a rancher who at worst may be negotiating his first lease in a lifetime and who probably may have leased the same tract a few years before on a similar form and did not get hurt because there was no development. *Id.* at 51.

8. Old time photographs show that the Wyoming Salt Creek oil field area was like a forest of closely adjacent wooden structure oil well rigs. No wonder there was no room for residences or a town on top of that prolific structure.

ing from *Magnolia Petroleum Co. v. Howard*, 182 Okl. 101, 77 P.2d 18, 20 (1938).

The surface subservient estate status was amplified in *Holbrook* as interpreting the federal lease. The Texas rule has been somewhat variously stated but consistently applied to favor the dominance of the lessee interests:

> It is elementary that the mineral lessee, insofar as the surface of land is concerned, possesses the dominant estate, and the lessor, or surface owner, has the servient estate. The mineral lessee, as the owner of the dominant estate, has the right to the use and possession of so much of the surface as is reasonably required in the operation of his mineral lease. * * * The rule of dual possession —i.e., that the mineral lessee is entitled to use so much of the leased premises as is required in its lease operations reasonably necessary for development and exploration, and that the surface owner has the right to use the portion of the surface not so required by the mineral lessee—does not apply where the rights of the parties are in conflict.

*Getty Oil Company v. Royal*, 422 S.W.2d 591, 593 (Tex.App.1967). *See likewise Ball v. Dillard*, 602 S.W.2d 521 (Tex.1980); *Getty Oil Company v. Jones*, 470 S.W.2d 618 (Tex.1971); *Humble Oil and Refining Company v. Williams*, 420 S.W.2d 133 (Tex.1967); *Brown v. Lundell*, 344 S.W.2d 863 (Tex.1961); and *Warren Petroleum Corp. v. Martin*, 153 Tex. 465, 271 S.W.2d 410 (1954). The quoted Texas rule is not essentially different from developed Wyoming law. Obviously, the damage provision presented here is significantly broader when compared to leases where damage is limited "to growing crops." [9]

Mingo Oil, as long as a valid lease exists, has a right of occupancy of the surface for development and production, and Kamp Cattle retains a right to be repaid for damages caused.

We reverse and remand for further proceedings in conformity herewith.

---

9. The growing crop concept of limited landowner damages has caused frequent argument in application to grazing lands of arid Wyoming.